UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF UP TO $83,000 OF FUNDS IN TD BANK ACCOUNT # 242-8517732 HELD IN THE NAME OF SEBASTIAN DEMERS | No. 2:22-mj-00087-KFW |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEIZURE WARRANT**

I, David Pawson, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. I make this affidavit in support of an application for a seizure warrant for up to $83,000 of funds in TD Bank Account # 242-8517732 held in the name of Sebastian Demers (the "Account").

2. I am a Special Agent (SA) with Homeland Security Investigations (HSI) and have been so employed since 2009. Prior to my tenure with HSI, I was employed as a Border Patrol Agent with the United States Border Patrol from 2005 until 2009. I have participated in numerous criminal investigations, including matters involving narcotics and controlled substances. In the course of my law enforcement career, I have conducted or participated in numerous drug-trafficking investigations and have drafted firearms and drug related search and arrest warrants. I have also assisted in the execution of numerous search and arrest warrants in which controlled substances, drug paraphernalia, and other contraband was found, including firearms. Through my training and experience, I have become familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs. The facts and information contained in this affidavit are based on my personal

1

knowledge, as well of that of other law enforcement officers involved in this and similar investigations.

3. The facts in this affidavit come from my investigation to date of Sebastian Demers, which includes interviews of individuals and Demers, review of information and records provided by financial institutions and businesses, and information from other law enforcement officials working on this investigation.

4. Based on the facts set forth in this affidavit, I have probable cause to believe that up to $83,000 in funds held in the Account are proceeds of drug trafficking, in violation of Title 21, United States Code § 841(a)(1), and thus subject to seizure, pursuant to 18 U.S.C. § 981(b) (as incorporated by 21 U.S.C. § 881(b))(civil) and 21 U.S.C. § 853(f)(criminal) and forfeiture, pursuant to 21 U.S.C. §§ 881(6)(civil) and 853(a)(criminal) .

## FACTS SUPPORTING PROBABLE CAUSE

5. In January of 2022, HSI began investigating Demers for the sexual exploitation of a minor and expanded the investigation to include drug trafficking and illegal possession of a firearm in March of 2022. *See United States v. Sebastian Demers,* Criminal No. 2:22-mj-68-KFW, ECF # 1; *In the matter of the search of: 72 Cumberland Avenue, Apartment 4, Portland, Maine,* 2:22-mj-70-KFW, ECF # 1 (the "SW Aff.").

6. As set forth in the prior affidavits, this investigation began with an allegation of sexual misconduct by Demers with an underage victim ("MV1"). According to MV1: (a) MV1 met Demers in late 2020 and had an on-and-off again relationship with Demers that continued through April of 2022 (SW Aff., ECF 1, ¶¶ 8, 14); (b) Demers sold marijuana, "dabs" (concentrated versions of butane hash oil), Ecstasy, MDMA, Xanax and heroin to others (Id., ¶

8); (c) Demers asked MV1 to sell drugs (acid, molly, mushrooms, cocaine, dabs, Adderall, Oxy and Xanax) to MV1's friends (Id., ¶ 10); (d) Demers sold drugs for a living, including cocaine and oxycodone (Id., ¶ 14); and (e) MV1 once saw Demers with a half kilo of cocaine (Id., ¶ 14).

7. A search of Demers cellular telephone pursuant to a search warrant revealed text messages between Demers and others regarding Demers' drug-dealing activities, including, but not limited to: (a) text conversations with a person ("T.V.") -- whom Demers identified during an interview as his source of drug supply -- during which the two speak about selling cocaine, oxycodone and other substances (Id., ¶¶ 15, 17); (b) Demers telling T.V. that he is selling 500 "Oxy's" (Oxycodone) in two days and furthermore that he was already selling 400 oxycodone pills per month (Id., ¶ 15); (c) text messages regarding a basket (3.5 grams) of cocaine and a half kilogram of cocaine (Id., ¶ 16); and (d) one conversation on Facebook in October 2021 between Demers and a woman named V.G. (Facebook User 100001705628263) wherein they discussed prices for pills and Demers told V.G. that he wanted "$200 for 10." (Id., ¶ 18).

8. On the morning of April 29, 2022, I and other law enforcement officers arrested Demers shortly after he left his apartment pursuant to a warrant issued by this Court. Demers was taken to the Portland Police Department, where he was advised of, and waived, his Miranda rights. Although Demers initially denied that he sold drugs, Demers eventually admitted that he purchased drugs from T.V. Demers expressed an interest in cooperating with law enforcement and told me and others that he could arrange a "buy" from T.V. that day. Eventually, however, Demers elected not to do so. Although he did not follow through with arranging the "buy," he did tell me that he was planning to meet with T.V. later that day to purchase four ounces of cocaine.

9. During the interview, Demers also told me that T.V. would travel to Methuen, Massachusetts to resupply his cocaine. Demers explained that T.V. travels to Massachusetts and meets with a member of a "Dominican Cartel." Demers told me that he traveled with T.V. once recently for the purpose of resupplying.

10. At the time of his arrest, Demers had approximately $4,600 in cash on his person and told me several times that he had $250,000 in cash.

11. In a text message exchange September 26, 2021 with MV1, Demers made the following statements:

> *I got pure coke from the cartel.*
> *60 a gram*
> *You can sell it to people in your school for $120 a gram.*
> *Double your money on every gram.*
> *Ask your friends who wants coke tell them its $100 a gram and I'll give it to you for $50 so you double your money*
> *I got acid for sale too*
> *10/$75*
> *You can sell them $15 a tab*
> *I'll give you 10/$75 and you can sell them 10/$150*
> *Double your money on acid too.*
> *Let me know if you wanna make money*

12. In another text/chat message on September 26, 2021, MV1 asks "it's not fake stuff right?" Demers replies, in part:

> *Na.*
> *The purest stuff around*
> *I been making $40K a month ....*

MV1 says: Ik you kno I like acid

Demers replies, in part:

> *Now I make tons of money and I feel like I owe it all to you*
> *You told me you tried it once*
> *I get it for $3.50 a tabs*

4

> *It sells for up to $15 a tap*
> *I'm getting it cheap*
> *I have legit plugs*
> *Mexican cartel*
> *I got a shipment coming from Atlanta too*
> *I have my hands in so many pots ....*

Later in the conversation, Demers says:

> *The cartel hooked me up*
> *God bless the cartel*
> *I triple my money all day long.*

13. In a conversation beginning on October 4, 2021 Demers asks a person ("G.C.") if he wants "these 4 15s and follows up with $60. G.C. responds, "Yeah, no ride tho." Based on my training and experience, I believe Demers was attempting to sell 15 milligram Oxycontin pills to G.C. Later in the thread which began on October 26, 22021, Demers posted the following four messages to G.C.:

> *I got acid*
> *and coke*
> *and dabs*
> *I'll have addys and Oxy soon*

14. I am aware that many controlled substances have street names in addition to their scientific identifiers. In this conversation with G.C., I believe that Demers is telling G.C. that he is selling five different controlled substances: Lysergic acid diethylamide (LSD), Cocaine HCL, Cannabis concentrates, Adderall, and Oxycontin.

15. On October 31, 2021, Demers continues the message thread with G.C. and asks, "who need fyntenol?" G.C. responds, "Like dope? Or just straight fent powder?" In this conversation Demers advises G.C. that the product is "Straight fetty" and that you can smoke the rocks in tin foil. G.C. responds, "I'd be down to try it." Demers further tells G.C. that "I been

5

selling grams for 100." I believe in this conversation Demers is attempting to sell Fentanyl to G.C. and based on the text conversation, G.C. would be a first-time user of this synthetic opioid.

16.     I further reviewed this conversation of October 31, 2021 in which Demers and G.C. continue to discuss the sale of fentanyl. At one point, G.C. requests to "test it." Demers response was, "Bro I do this for a living." This conversation continues for an additional two hours and 45 minutes during which Demers tells G.C. "plus I still have to deal with a ton of customers," "I sell to dozens of people," and "I only sell real shit." I believe after reading the messages of October 31, 2021, that Demers was offended by G.C.'s inference that the substances Demers sells are fake or of lesser quality.

17.     I also observed that the following day, on November 1, 2021, Demers re-engages G.C. writing, "still got about $50 left of that, if you want it." G.C. responded "I do just don't have the cash rn, still playing the waiting game." Demers then suggest G.C. "give me a strap, collateral" for the fentanyl. I am aware that a strap is commonly used street name for a firearm.

18.     In another exchange on October 7, 2021, Demers says that he makes $100,000 per year because he does not let people take advantage of him. He also said that he makes $10,000 per week.

19.     In a text message on October 22, 2021, with another individual named Heather, they agree on a price of $150 for 17 "Addies" (believed to be Adderall). Demers tells her that she can pay in cash or "Cash App." She sent him $90 on Cash App and was paying $60 in cash.

20.     During this investigation, records were obtained for the Account and a second TD Bank account in Demers' name ending in 1705 (the "1705 account"). A Forfeiture Financial

6

Specialist at the U.S. Attorney's Office has reviewed the records and provided the information set forth below:

    a. The records of the two accounts covered the time period May 21, 2021, to April 29, 2022, except for transactions on March 31, 2022.

    b. There were many transfers back and forth between the accounts, almost on a daily basis and sometimes multiple transfers in one day. For example, there are about 259 transfers from the 1705 account to the Account during the period and 315 transfers from the Account to the 1705 account.

    c. As of May 20, 2021 the balance in the Account was $42,764.61. Deposits into the Account for the period totaled $292,004.95, of which $153,868.15 were transfers from the 1705 account. Unemployment compensation checks from the State of Maine were deposited between May and September 2021, and totaled $10,976. No deposits into the Account could be identified as being wages from an employer. Cash deposits totaled $73,885.80. Apple Cash deposits totaled $9,331.75. PayPal deposits totaled $6,718.16. There were also $4,704 in deposits from 60 transactions made through Facebook Pay from several individuals. Many transactions were $60 or $80 each.

    d. Disbursements from the Account included $127,213.80 in transfers to the 1705 account. Cash withdrawals totaled $33,272. Disbursements of $2,401 went to T.V., Demers' source of supply.

    e. Deposits to the 1705 account during this period totaled $223,641.24, of which $127,541.45 were transfers from the Account. Cash deposits to the 1705 account totaled $71,771.48. Deposits from Cash App – Cash Out, a money transfer entity, totaled $24,146.58.

    f. As mentioned in Paragraph 19 above, there was an apparent drug sale with an individual by the name of Heather on October 22, 2021. It involved a payment of $90 through Cash App. A review of the 1705 account reflects a deposit of $88.65 on that date from Cash App. Internet research indicates that Cash App charges a 1.5% fee for instant transfers. Thus, a $90 transaction would result in a net amount of $88.65 to the payee. At the end of the business day on October 22, 2021, the balance in the 1705 account was $1,036.69. On October 25, 2021 (the next banking day), Demers transferred $1,000 to the Account and then transferred $2,000 the same day back to the 1705 account. The following day, October 26, 2021, he disbursed $1,500 via Cash App to T.V., his source of supply.

    g. Disbursements from the 1705 account included cash withdrawals totaling $23,160. Disbursements to T.V., Demers' source of supply, totaled $31,885.

    h. Total payments to T.V., Demers' source of supply, between the two accounts were $34,286. Generally, money was moved from the Account to the 1705 account just before payments were made to T.V

    i. Cash deposits to the two accounts combined totaled $145,657.28.

    j. As of June 3, 2022, the balance of the Account was approximately $83,000. The balance of the 1705 account was minimal.

21. On April 29, 2022, a court-authorized search warrant was executed at Demers' residence on Cumberland Avenue in Portland, Maine. The following items were seized at that time:

    a. 64.31 grams of cocaine hcl (presumptive);

    b. 19 tabs of LSD (presumptive);

    c. 20 packages of Buprenorphine and Naloxone Sublingual film 8mg/2mg (Opiate Antagonist);

    d. Taylor brand digital scale with residue;

    e. Empty gel capsules;

    f. Zip lock bags (approximately 1 inch square (Packaging material); and

    g. Razor blade with residue.

*In the matter of the search of: 72 Cumberland Avenue, Apartment 4, Portland, Maine,* 2:22-mj-70-KFW, ECF # 3.

22. Crediting Demers statement that he was tripling his money (*see* Paragraph 12 above), there is probable cause to believe that $102,858 ($34,286 x 3) in drug proceeds were generated from drug purchased from T.V.

23. During his interview, Demers' claimed to be in the business of buying and reselling used phones, watches, electronics and cars. During the execution of the search warrant, agents learned that Demers used H&R Block to prepare his 2021 federal income tax return and that in 2021 Demers received $24,696 as unemployment compensation. Tax return records for 2021 obtained from H&R Block revealed that Demers only reported as income the $24,696 he received as unemployment compensation. Since Demers reported no income from any other legitimate source other than unemployment compensation, there is probable cause to believe that the $145,657.28 in cash deposited into the accounts is the proceeds of, or property that facilitated, illegal drug trafficking.

## APPLICABLE STATUTES

24. 21 U.S.C.§ 841, makes it a federal crime for anyone, to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance.

25. 21 U.S.C. § 881(a)(6) provides for the civil forfeiture of all moneys … or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance… in violation of this subchapter….

26. 21 U.S.C. § 853(a) subjects to criminal forfeiture proceeds and property that facilitates felony drug trafficking.

27. Under 28 U.S.C. § 1355(b)(1)(A), "[a] forfeiture action or proceeding may be brought in the district court for the district in which any of the acts or omissions giving rise to forfeiture occurred."

28. Under 18 U.S.C. § 981(b)(2), the Attorney General may seize property subject to civil forfeiture when the Attorney General obtains a warrant "in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."

29. Under 21 U.S.C. § 853(f), the Government may request a seizure warrant for property subject to criminal forfeiture in the same manner as provided for a search warrant.

30. In cases where the Government is not certain at the time of the seizure if it will pursue civil or criminal forfeiture, courts may issue the seizure warrant under both 18 U.S.C. § 981(b), and 21 U.S.C. § 853(f). The probable cause showing is the same for Sections 981(b) and 853(f), except that the latter also requires a showing that a restraining order "may not be sufficient to assure the availability of the property for forfeiture."

31. With respect to fungible property, including cash and funds deposited in a financial institution, 18 U.S.C. § 984 provides, in relevant part, that:

> (a)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . ., or precious metals:
>
> (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
>
> (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.
>
> (2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.
>
> (b) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

32.     Based on my training, I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of set-off to satisfy an outstanding debt owed to the bank by the account holder. In contrast, where electronic funds are concerned, a seizure warrant guarantees that the funds will be in the Government's custody once the warrant is executed.

## Conclusion

33. The facts set forth above establish probable cause to believe that up to $83,000 of funds on deposit in the Account are proceeds of drug trafficking, in violation of Title 21 U.S.C. § 841. I hereby seek authorization to seize for forfeiture up to $83,000 of funds present in the Account.

I, David Pawson, hereby swear under oath that the information set forth in this Affidavit is true and correct to the best of my knowledge, information, and belief, and that I make this oath under pains and penalties of perjury.

Dated at Portland, Maine, this 9th day of June 2022.

David Pawson
Special Agent
Homeland Security Investigations

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Jun 09 2022

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title